UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
TRACY L. JOHNSON, as Personal Representative of the   Docket No.: 23-cv-02407
Estate of ESIAS JOHNSON, Deceased,

                              Plaintiff,

                -against-

CITY OF NEW YORK, NEW YORK CITY HEALTH
AND HOSPITALS CORPORATION, KERLINE
LUBIN, ALEXANDRE GUIRAND, JR., HARLAND
ARISTIDE, ANGELO ERLAND LESSEY, DANIEL
MORRIS, M.D., and JOHN DOES 1-5,

                        Defendants.
-------------------------------------------------------------------X

**SECOND AMENDED
COMPLAINT**

PLAINTIFF DEMANDS TRIAL
BY JURY

       Plaintiff TRACY L. JOHNSON, as Personal Representative of the Estate of ESIAS

JOHNSON, by her attorneys, KELNER & KELNER, ESQS., as and for her Amended Verified

Complaint in the above-captioned action, hereby alleges as follows upon information and belief:

### As and For a First Cause of Action

      1.      On or about September 7, 2021, Esias Johnson died, leaving distributees

surviving.

      2.      Plaintiff TRACY L. JOHNSON was issued Letters of Authority to act as the

Personal Representative of the Estate of ESIAS JOHNSON, in the County of Essex, State of

Massachusetts, and is presently acting in such capacity.

      3.      At all times herein mentioned, defendant CITY OF NEW YORK was and remains

a municipal corporation, duly organized and existing under and by virtue of the laws of the State

of New York.

      4.      At all times herein mentioned, the New York City Department of Correction was

and remains an agency, subdivision, and/or instrumentality of the CITY OF NEW YORK.

1

5.      In November 22, 2021, plaintiff duly and timely served a Notice of Claim on defendant CITY OF NEW YORK, pursuant to General Municipal Law §50-e.

6.      On February 14, 2022, plaintiff appeared for a hearing pursuant to General Municipal Law §50-h noticed by the City of New York.

7.      This action was commenced against the CITY OF NEW YORK within one year and 90 days from when the within causes of action accrued and is timely.

8.      At all times herein mentioned, defendant CITY OF NEW YORK, its agents, servants, and/or employees, owed decedent a common law duty of care, including, but not limited to, affording him reasonable supervision, protection, and access to medical care.

9.      On and prior to September 7, 2021, Esias Johnson was being detained at the Rikers Island Correctional Facility, in the County of Bronx, State of New York.

10.      On and prior to September 7, 2021, Esias Johnson was being detained at the Rikers Island Correctional Facility, and was within the care, custody, and control of defendant CITY OF NEW YORK, by and through its Department of Correction.

11.      The CITY OF NEW YORK owned, operated, managed, maintained, and controlled the Rikers Island Correctional Facility.

12.      On and prior to September 7, 2021, decedent was housed within the Anna M. Kross Center (AMKC).

13.      On and prior to September 7, 2021, decedent was housed within AMKC "MOD 9B."

14.      At all times herein mentioned, defendant KERLINE LUBIN (hereinafter "LUBIN") was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

2

15.    At all times herein mentioned, defendant ALEXANDRE GUIRAND, JR., (hereinafter "GUIRAND") was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

16.    At all times herein mentioned, defendant HARLAND ARISTIDE (hereinafter "ARISTIDE") was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

17.    At all times herein mentioned, defendant ANGELO ERLAND LESSEY (hereinafter "LESSEY") was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

18.    At all times herein mentioned, defendant JOHN DOES 1-5, fictitious names, their real names being unknown, were employed by defendant CITY OF NEW YORK as members and/or officers of the New York City Department of Correction.

19.    Plaintiffs undertook reasonably diligent efforts to identify officers JOHN DOES 1-5 but said information is presently within the sole and exclusive custody of the defendants herein.

20.    At all times herein mentioned, defendants LUBIN, GUIRAND, ARISTIDE, and LESSEY were acting within the scope of their employment with defendant CITY OF NEW YORK.

21.    At all times herein mentioned, defendants JOHN DOES 1-5 were acting within the scope of their employment with defendant CITY OF NEW YORK.

22.    At all times herein mentioned, defendants LUBIN, GUIRAND, ARISTIDE, and LESSEY were acting under color of law, on behalf of the defendant CITY OF NEW YORK, and with the power and authority vested in them as a consequence thereof.

3

23.     At all times herein mentioned, defendants JOHN DOES 1-5 were acting under color of law, on behalf of the defendant CITY OF NEW YORK, and with the power and authority vested in him/her as a consequence thereof.

24.     At all times herein mentioned, defendant DANIEL MORRIS, M.D., was employed and/or otherwise engaged by the NEW YORK CITY HEALTH AND HOSPITALS CORPORATION.

25.     At all times herein mentioned, defendant MORRIS was acting under color of law, on behalf of the defendant CITY OF NEW YORK and/or the NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, and with the power and authority vested in him as a consequence thereof.

26.     At all times herein mentioned, defendant CITY OF NEW YORK, through its agents, servants, and/or employees had a duty to use reasonable care to protect the health and safety of persons in its custody at Rikers Island.

27.     At all times herein mentioned, defendant CITY OF NEW YORK, through its agents, servants, and/or employees, was responsible for the supervision of housing units at Rikers Island and had a duty to provide detainees with prompt access to medical care.

28.     At all times herein mentioned, defendants LUBIN, GUIRAND, ARISTIDE, LESSEY, and JOHN DOES 1-5 had supervisory responsibilities and/or authority over decedent's housing unit.

29.     On and prior to September 7, 2021, defendants failed to provide good, adequate, and sufficient supervision and/or monitoring of decedent's housing unit.

30.    On and prior to September 7, 2021, decedent Esias Johnson, while committed to the care, custody, and control of the CITY OF NEW YORK, required medical attention and/or experienced a medical event.

31.    On and prior to September 7, 2021, defendants failed to supervise and/or monitor decedent, and/or respond to his need for medical care.

32.    The causes of action set forth herein are not subject to Article 16 of the CPLR and/or come within one or more of the stated exceptions thereto set forth in CPLR 1602.

33.    By reason of the foregoing, decedent was caused to sustain severe injuries, conscious pain and suffering, fear of impending death, from the time of said occurrence up to the time of his death, and death.

34.    The aforesaid occurrence and injuries resulting to decedent therefrom was proximately caused by the carelessness, recklessness, and negligence of the CITY OF NEW YORK in the ownership, operation, management, maintenance, and control of the Rikers Island Correctional Facility, including, but not limited to, the Anna M. Kross Center; in failing to provide good, adequate, and sufficient supervision of the decedent; leaving him without supervision; violating guidelines for the provision of medical treatment to inmates; failing to respond to decedent's complaints; failing to take decedent to the clinic and/or hospital; failing to take him to the clinic timely and/or to timely call medical personnel to his cell; failing to respond and/or appropriately and timely respond to his medical symptoms and requests for care; ignoring decedent's need for medical attention; delaying and/or denying treatment; failing to respond to a history of shortfalls and inadequacy in staffing; in each of the respects set forth above; and in otherwise causing, allowing, and permitting the subject occurrence herein.

35.     By reason of the foregoing, plaintiff has been damaged in the sum of TWENTY MILLION ($20,000,000.00) DOLLARS.

## As and For a Second Cause of Action

36.     Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 35 as though set forth more fully herein.

37.     As a result of the foregoing, decedent Esias Johnson was caused to suffer wrongful death.

38.     Decedent's wrongful death was proximately caused by the carelessness, recklessness, and/or negligence of the CITY OF NEW YORK and NYCH+H, their agents, servants, and/or employees, including, but not limited to, in each and all of the respects set forth in the First Cause of Action above.

39.     By reason of the foregoing and the wrongful death of the plaintiff's decedent, plaintiff on behalf of herself and any and all distributees of the decedent has been damaged in the sum of TWENTY MILLION ($20,000,000.00) DOLLARS.

## As and For a Third Cause of Action

40.     Plaintiff repeats, reiterates and realleges the allegations set forth in paragraphs 1 through 39 as if more fully set forth herein.

41.     Defendant CITY OF NEW YORK, through its Department of Corrections, negligently hired and/or retained employees responsible for the care, supervision, and monitoring of decedent, including, but not limited to LUBIN, GUIRAND, ARISTIDE, LESSEY, and JOHN DOES 1-5, with knowledge of their propensity for the type of behavior which resulted in ESIAS JOHNSON's death in this action.

42.    That Defendants knew or should have known of the officers' propensity for the conduct that caused Esias Johnson's death.

43.    Defendants negligently failed to properly train and/or supervise its employee officers.

44.    By reason of the foregoing, decedent was caused to sustain severe injuries, conscious pain and suffering, fear of impending death, from the time of said occurrence up to the time of his death, and death.

45.    By reason of the foregoing, plaintiff has been damaged in the sum of TWENTY MILLION ($20,000,000.00) DOLLARS.

### As and For a Fourth Cause of Action

46.    Plaintiffs repeat, reiterate, and reallege the allegations set forth in paragraphs 1 through 45 as though set forth more fully herein.

47.    As a result of the foregoing, decedent Esias Johnson was caused to suffer wrongful death.

48.    Decedent's wrongful death was proximately caused by the carelessness, recklessness, and/or negligence of the CITY OF NEW YORK, their agents, servants, and/or employees, including, but not limited to, in each and all of the respects set forth in the Third Cause of Action above.

49.    By reason of the foregoing and the wrongful death of the plaintiff's decedent, plaintiff on behalf of herself and any and all distributees of the decedent has been damaged in the sum of TWENTY MILLION ($20,000,000.00) DOLLARS.

### As and For a Fifth Cause of Action

50.     Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 49 as though set forth more fully herein.

51.     At all times herein mentioned, defendant NEW YORK CITY HEALTH AND HOSPITALS CORPORATION (hereinafter "NYCH+H") was and remains a public benefit corporation, duly organized and existing under and by virtue of the laws of the State of New York.

52.     On September 30, 2022, plaintiff commenced a special proceeding in the Supreme Court of the State of New York, County of Bronx, for leave to serve a late notice of claim on NYCH+H, pursuant to General Municipal Law §50-e.

53.     On November 23, 2022, it was stipulated and agreed, by and between counsel for plaintiff and NYCH+H that plaintiff would be permitted to serve a late notice of claim on NYCH+H and that said notice of claim was deemed timely served *nunc pro tunc* on October 25, 2022.

54.     More than thirty (30) days have elapsed since said notice of claim was served upon defendant, and defendant and/or its comptroller has failed, neglected and/or refused to pay, settle, and/or adjust plaintiff's claim.

55.     No hearing pursuant to General Municipal Law §50-h has been demanded by NYCH+H within the time allotted by law.

56.     This action has been commenced within one year and ninety days of the subject occurrences herein and is timely.

57.     At all times herein mentioned, defendant NYCH+H, by and through its Correctional Health Services division, was retained, contracted, and/or designated by law as the health care provider for inmates and detainees at the Rikers Island Correctional Facility.

58.     At all times herein mentioned, defendant NYCH+H represented that the physicians, nurses, nurse practitioners, physicians' assistants and other medical personnel in its employ, including, but not limited to, through its Correctional Health Services division, were competent and qualified to render medical, diagnostic, and other care and services in accordance with good and accepted standards of practice.

59.     On and following August 8, 2021, decedent, while a detainee at Rikers Island, presented to physicians and/or other personnel employed by defendant NYCH+H.

60.     At all times herein mentioned, each and all of the physicians, nurses, nurse practitioners, physicians' assistants and other medical personnel who undertook to render treatment were employees and/or actual and/or apparent agents of defendant NYCH+H.

61.     At all times hereinafter mentioned, defendant NYCH+H, its agents, servants, and/or employees undertook and agreed to render medical care to decedent commencing on August 8, 2021, and continuing through the date of his death on September 7, 2021.

62.     The medical, diagnostic and other care, treatment and services rendered by defendant, its agents, servants and/or employees, to decedent were performed in a negligent and careless manner, not in keeping with the standards customarily employed in the medical community at large, including, but not limited to, in failing to properly examine, obtain timely consults, and otherwise render good and sufficient treatment to decedent; in failing to monitor decedent's medical condition prior to the time of his death; in improperly prescribing him methadone; in failing to provide him with alternatives to methadone, including, but not limited to, detoxication and/or Suboxone and/or Naltrexone; in continuing to prescribe him methadone despite the lack of follow up care; in failing to conduct follow up visits and/or monitoring; in failing to perform diagnostic tests and/or bloodwork; in failing to treat his medical condition; in

failing to provide him with access to medical care as required; in failing to respond to decedent's complaints; in ignoring decedent's need for medical attention; in failing to take or refer decedent to the hospital; in delaying and/or denying treatment; in failing to render medical care in accordance with good and accepted standards; in failing to take account of his symptomology as reported or reasonably observable; in failing to ensure his evaluation by specialists as required; in failing to timely follow up; in failing to prescribe medications as required; in ignoring or failing to address decedent's need for medical attention; in delaying and/or denying treatment; failing to render medical care in accordance with good and accepted standards; and in otherwise causing, allowing, and/or permitting his pain and suffering and wrongful death.

63.     The foregoing proximately caused decedent to sustain severe, serious, and permanent personal injuries, conscious pain and suffering, fear of impending death, and death.

64.     The causes of action set forth herein are not subject to Article 16 of the CPLR, and/or comes within one or more of the stated exceptions thereto set forth in CPLR 1602.

65.     By reason of the foregoing, plaintiff has been damaged in the sum of TWENTY MILLION ($20,000,000.00) DOLLARS.

## As and For a Sixth Cause of Action

66.     Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 65 as though set forth more fully herein.

67.     As a result of the foregoing, decedent Esias Johnson was caused to suffer wrongful death.

68.     Decedent's wrongful death was proximately caused by reason of the negligence and/or medical malpractice of defendant NYCH+H, including, but not limited to, in each and all of the respects set forth above.

69.     By reason of the foregoing and the wrongful death of the plaintiff's decedent, plaintiff on behalf of herself and any and all distributees of the decedent has been damaged in the sum of TWENTY MILLION ($20,000,000.00) DOLLARS.

**<u>As and For a Seventh Cause of Action</u>**

70.     Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 69 as though set forth more fully herein.

71.     At the time of the subject occurrence, defendants LUBIN, GUIRAND, ARISTIDE, LESSEY, and JOHN DOES 1-5 ("the Officer Defendants") had responsibilities for the care and protection of inmates and detainees concerning decedent's housing unit at AMKC, including, but not limited to, in obtaining them access to medical care.

72.     On, about, and prior to September 1, 2021, defendant MORRIS undertook to provide medical care to decedent.

73.     Defendant MORRIS undertook to provide medical care to decedent, including, but not limited to, with respect to treatment, monitoring, and care concerning his physical and/or mental condition, including, but not limited to, the prescription and/or monitoring of the prescription of methadone.

74.     MORRIS made a medical note concerning his appointment with decedent on and/or about September 1, 2021, in which he recorded, in sum and substance, the following: Decedent reported using 110 mg of unprescribed methadone daily for the past week, which he had obtained from another patient, and was "drinking liquid from a water bottle that he says is methadone." Based on the history provided, decedent was prescribed or caused to be prescribed methadone by MORRIS, starting with 30 mg daily for three days, then 40 mg daily for three

days, then 50 mg daily for three days, then 60 mg daily for 51 days. Decedent was also "advised" by MORIS to "avoid extra methadone."

75.     Following MORRIS' prescription of methadone to decedent, there was no and/or substantially no medical monitoring, follow up care, testing, and/or treatment prior to his death, and/or no adjustment with respect to the dosages of methadone he was being prescribed.

76.     Defendant MORRIS failed to monitor decedent's intake of methadone following its prescription and/or make other or further efforts to ensure said methadone was being properly and safely administered without causing, creating, and/or contributing to risks to decedent's safety.

77.     Defendant MORRIS failed to monitor decedent's intake of methadone following its prescription and/or make other or further efforts to ensure said methadone was being properly and safely administered without causing, creating, and/or contributing to risks to decedent's safety, despite knowledge that administration of same in the absence of appropriate monitoring posed a severe hazard to decedent's health and safety.

78.     Defendant MORRIS neglected decedent's health and safety.

79.     The medical, diagnostic and other care, treatment and services rendered by defendant MORRIS reflected his deliberate indifference to the health and safety of decedent, including, but not limited to, in failing to properly examine, obtain timely consults, and otherwise render good and sufficient treatment to decedent; in failing to monitor decedent's medical condition prior to the time of his death; in improperly prescribing him methadone; in failing to provide him with alternatives to methadone, including, but not limited to, detoxication and/or Suboxone and/or Naltrexone; in continuing to prescribe him and/or allow him to obtain methadone despite the lack of follow up care; in failing to conduct follow up visits and/or

monitoring; in failing to perform diagnostic tests and/or bloodwork; in failing to treat his medical condition; in failing to provide him with access to medical care as required; in failing to respond to decedent's complaints; in ignoring decedent's need for medical attention; in failing to take or refer decedent to the hospital; in delaying and/or denying treatment; in failing to render medical care in accordance with good and accepted standards; in failing to take account of his symptomology as reported or reasonably observable; in failing to ensure his evaluation by specialists as required; in failing to timely follow up; in failing to prescribe medications as required; in ignoring or failing to address decedent's need for medical attention; in delaying and/or denying treatment; failing to render medical care in accordance with good and accepted standards; and in otherwise causing, allowing, and/or permitting his pain and suffering and wrongful death.

80.     Defendants owed a duty under the Fifth, Eighth Amendment, and/or Fourteenth Amendments to the United States Constitution, including, but not limited to the Due Process Clause thereof, to take reasonable measures to protect the safety of detainees in their custody and to provide them with prompt access to medical care and to afford them medical care that comported with constitutional standards.

81.     Esias Johnson was subjected to a serious deprivation of these rights by being provided constitutionally inadequate medical care, including, but not limited to, in each and all of the respects set forth above; and in being left without supervision and/or adequate supervision and the consequent and further unconscionable delay in the provision of access to medical care.

82.     The Officer Defendants' failure to supervise decedent, abandonment of decedent, and denial of his right to medical care, and defendant MORRIS' failure to provide medical care,

monitoring, and follow-up care in accordance with constitutional and medical standards represented violations of his civil and constitutional rights.

83.    The Officer Defendants and defendant MORRIS were deliberately indifferent to the health and safety the inmates and detainees in their charge, including decedent.

84.    The Officer Defendants and defendant MORRIS, under color of state law, subjected the decedent to the foregoing acts and omissions in violation of 42 U.S.C. §1983, thereby depriving him of rights, privileges, and immunities secured by the United States Constitution, including the Fifth, Eighth, and Fourteenth Amendments thereto.

85.    As a result of the foregoing, Esias Johnson was caused to sustain severe, serious, and permanent personal injuries, conscious pain and suffering, and fear of impending death.

86.    By reason of the foregoing, decedent's Estate has sustained damages in the sum of TWENTY MILLION ($20,000,000.00) DOLLARS.

87.    Plaintiff further claims punitive damages against the individual defendants in amounts to be assessed by a jury.

88.    Plaintiff further claims attorney's fees, pursuant, inter alia, to 42 U.S.C. §1988.

**As and for a Eighth Cause of Action**

89.    Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 88 as though set forth more fully herein.

90.    Defendants LUBIN, GUIRAND, ARISTIDE, LESSEY, MORRIS, and JOHN DOES 1-5 subjected the decedent to the foregoing acts and omissions in violation of 42 U.S.C. §1983, thereby depriving him of rights, privileges, and immunities secured by the United States Constitution, including the Fifth, Eighth, and Fourteenth Amendments thereto.

91.     As a result of the foregoing, decedent Esias Johnson was caused to suffer wrongful death.

92.     By reason of the foregoing and the wrongful death of the plaintiff's decedent, plaintiff on behalf of herself and any and all distributees of the decedent has been damaged in the sum of TWENTY MILLION ($20,000,000.00) DOLLARS.

93.     Plaintiff further claims punitive damages against each and all of the named defendants herein, in amounts to be assessed by a jury.

94.     Plaintiffs further claims attorney's fees, pursuant, inter alia, to 42 U.S.C. §1988.

### As and For a Ninth Cause of Action

95.     Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 94 as though set forth more fully herein.

96.     This incident was proximately caused by the CITY OF NEW YORK's deliberate indifference to the constitutional rights of detainees and/or inmates to reasonable protection from injury and harm while in custody and timely access to medical care.

97.     Rikers Island has been under the supervision of a monitor since 2015, in accordance with the Consent Judgment entered in *Nunez v. City of New York*, et al., 11-cv-5845 (LTS) (SDNY).

98.     On May 11, 2021, months before Esias Johnson died, the Nunez Monitor submitted his Eleventh Report concerning conditions at Rikers Island, documenting the status of the City's compliance with the Consent Judgment reached in that action.   The Monitor wrote in his report that the "the pervasive level of disorder and chaos" at Rikers was "alarming." (Monitor Eleventh Report, at 4).

99.     The Monitor observed, as he had in his prior reports, that the City's employees in supervisory capacities at Rikers Island were resistant to changing practices in ways that would protect inmate safety and security.  He wrote that the existing leaders of the facility "do not seem to be capable of dismantling the dysfunctional/abusive culture at the Facilities and replacing it with one built on dignity, respect, and problem-solving."  (Monitor Eleventh Report, at 9).  They exhibited a "lack of buy-in" to the need to reform practices, "rarely emerge as champions of an idea or new practice and often seem to be myopic…." (Monitor Eleventh Report, at 9-10).

100.     The Monitor also reported that there was widespread dysfunction and neglect in the assignment and distribution of correctional staff throughout the facility, jeopardizing the health and safety of the incarcerated population.  He wrote: "The Department struggles to manage its large number of Staff productively, to deploy them effectively, to supervise them responsibly, and to elevate the base level of skill of its Staff. All of this has a direct impact on the Department's ability to reduce the level of violence and ensure the safety and well-being of Staff and incarcerated individuals." (Monitor Eleventh Report, at 10).

101.     Posts in the facility necessary to the protection of inmates were routinely left unfilled or were staffed by officers working shifts so long that it undermined their ability to do the job adequately.

102.     The idea that Rikers Island could have staffing shortfalls that would prevent it from carrying out the basic missions of a jail is itself a product of the breakdown in order at the facility.  Rikers Island does not want for correctional personnel.  It has, as the Monitor wrote, "one of the richest staffing ratios among the systems with which the Monitoring Team has had experience." (Monitor Eleventh Report, at 10-11).

103.    However, an extraordinarily high number of correctional personnel were permitted to remove themselves, without consequence, from availability to work.  "As of March 27, 2021, approximately 2,040 Staff were not available to work."  (Monitor Eleventh Report, at 15).  This extraordinarily high rate of absenteeism was brought about, in substantial part, by "lackadaisical practices for verifying Staff's health and/or ability to return to work, and a lack of accountability for Staff who abuse the procedures."  (Monitor Twelfth Report , at 33-34).

104.    The Department of Correction, as a matter of course, permitted and ignored prolonged and serial absenteeism without consequence.

105.    Even without the unavailable personnel, the Department of Correction still had an extremely high cohort of available staff to assign to postings in the jail – and in fact, a roughly 1:1 ratio between incarcerated individuals and staff.

106.    However, the City deployed its staff in a manner not calculated to provide sufficient protection and care to its incarcerated population.  This included the assignment of inordinate numbers of personnel to administrative postings or other areas where they were either gratuitous or not immediately necessary.  The New York Times reported that "on days [in 2021] when guard posts in volatile Rikers housing units went unfilled, hundreds of other correction officers were stationed elsewhere in less dangerous positions, including as secretaries, laundry room supervisors and even bakers."

107.    The Times further reported that "of the more than 8,900 sworn officers on the department's payroll in February, about 850 were stationed at the department's Queens headquarters, at its training academy or in other positions require little or no contact with detainees."  And between 370 and 750 guards were assigned to daily posts at Manhattan Detention Complex during a period in which the facility was holding, on the average, less than

one-tenth that many detainees.  On one day, 16 officers in the George R. Vierno Center at Rikers Island were required to work consecutive shifts supervising detainees, while "the same jail had five guards working as warden secretaries, two guards in the mailroom and one guard each in the counsel room, storehouse and tool crib."

108.     The City's decision to leave inmates unsupervised or inadequately supervised in housing units, where they face immediate risks to their health and safety, despite the availability of personnel who could provide such supervision, is a reflection of its deliberate indifference to the rights of inmates and detainees in its charge.

109.     The staffing shortages and misallocations of personnel existed for a prolonged period of time and were well known to the City of New York, which nonetheless allowed them to persist.

110.     Rikers Island's staffing and managerial neglect, the product of the City's longstanding deliberate indifference to the constitutional rights of its incarcerated population, left detainees like Esias Johnson in grave danger.

111.     Dr. Ross McDonald, NYCH+H's Chief Medical Officer for its Correctional Health Services division, wrote a letter to the New York City Council reporting his alarm.  He wrote: "Unfortunately, in 2021 we have witnessed a collapse in basic jail operations, such that today I do not believe the City is capable of safely managing the custody of those it is charged with incarcerating in its jails…."   He also noted that "[d]eath and injury are predictable consequences of repeated failures to perform certain essential functions due to the unavailability of staff."  This included "failing to provide correctional staff to supervise some housing areas or observe incarcerated people placed on suicide watch."

112.    The City's longstanding deliberate indifference to the rights of those incarcerated at Rikers has led to numerous deaths, representing a pattern that should have placed all involved on notice of the urgent need to provide constitutionally sufficient protection.  In 2021 alone, at least nine other detainees and/or inmates died before Esias Johnson at Rikers Island:  Wilson Diaz-Guzman (January 22); Tomas Carlo Camacho (March 2); Javier Velasco (March 19); Thomas Earl Braunson III (April 19); Richard Blake (April 30); Jose Mejia Martinez (June 10); Robert Jackson (June 30); Brandon Rodriguez (August 10); and Segundo Guallpa (August 30).  This is in addition to the numerous individuals who had died at Rikers in prior years due to the City's neglect.

113.    New York City Mayor Eric Adams has referred to Rikers as a "national embarrassment" and a "stain on our city" that must be closed for good.

114.    The City's cultural, managerial, and staffing dysfunction at Rikers, including, but not limited, manifested itself in at least two ways as it related to Esias Johnson.

115.    After being prescribed methadone on September 1, 2021, he missed approximately *six* necessary medical visits before his death on September 7, 2021, many or all of which were due to failures to produce him by correctional staff.

116.    The Department of Correction has systematically failed to produce persons in custody at Rikers for medical visits.  In August of 2021, the month before Esias died, more than 10,000 scheduled medical appointments were missed at Rikers Island. More than 2,000 of them were for detainees and inmates at AMKC, where Esias was housed. In September of 2021, there were 8,328 missed medical visits, of which 2,619 were from AMKC.  A number of missed medical visits were attributed to a reporting category called "Other," which encompasses instances were escorts are unavailable.  A number of missed visits were also dubiously attributed

to "inmate refusals," the credibility of which is deeply dubious. *See, e.g.,* Rachel Sherman,

Rikers Staffing Crisis Limits Access to Medical Care, *The City* [Aug. 26, 2021) (accessible at

*https://www.thecity.nyc/health/2021/8/26/22643199/rikers-staffing-crisis-medical-care*).

117.    The City's pattern and practice of denying persons in custody access to medical

visits, including Esias Johnson, is reflective of its deliberate indifference to their right to medical

access.

118.    Esias should not even still have been at Rikers Island to begin with at the time of

his death.  On or about August 6, 2021, he was remanded to Rikers on bail of *$1*.  His family was

willing and able to post such bail, and even attempted to do so online.  However, he was not

produced for his scheduled court date of August 20, 2021, resulting in his continued confinement

at Rikers on a single dollar.

119.    There were also staffing failures and/or shortages in his housing unit on the night

of his death.

120.    The CITY OF NEW YORK's deliberate indifference to the safety of inmates in at

Rikers Island, and their rights under the Fifth, Eighth, and Fourteenth Amendments to the United

States Constitution, proximately caused the subject occurrence and decedent's injuries and death.

121.    By reason of the foregoing, defendant CITY OF NEW YORK, under color of

state law, subjected the decedent to the foregoing acts and omissions in violation of 42 U.S.C.

§1983, thereby depriving him of rights, privileges, and immunities guaranteed to him by the

United States Constitution.

122.    By reason of the foregoing, decedent's Estate has sustained damages in the sum of

TWENTY MILLION ($20,000,000.00) DOLLARS.

123.    Plaintiff further claims attorney's fees, pursuant, inter alia, to 42 U.S.C. §1988.

**<u>As and For a Tenth Cause of Action pursuant to 42 U.S.C. §1983 against defendant CITY OF NEW YORK</u>**

124.    Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 123 as though set forth more fully herein.

125.    Defendant CITY OF NEW YORK, under color of state law, subjected the decedent to the foregoing acts and omissions in violation of 42 U.S.C. §1983, thereby depriving him of rights, privileges, and immunities guaranteed to him by the United States Constitution.

126.    As a result of the foregoing, decedent was caused to suffer wrongful death.

127.     By reason of the foregoing and the wrongful death of the plaintiff's decedent, plaintiff on behalf of herself and any and all distributees of the decedent has been damaged in the sum of TWENTY MILLION ($20,000,000.00) DOLLARS.

128.    Plaintiff further claims attorney's fees, pursuant, inter alia, to 42 U.S.C. §1988.

### <u>Conclusion</u>

WHEREFORE, plaintiff demands judgment against the defendants, on each and all of the causes of action asserted herein, in the sum of TWENTY MILLION ($20,000,000) DOLLARS; punitive damages to be assessed against the individual defendants; statutory attorneys fees; and the costs and disbursements herein.

Dated: New York, New York
      August 10, 2023

                    Yours, etc.,

                    KELNER & KELNER, ESQS.
                    *Attorneys for Plaintiff*

                    By: _____
                      Joshua D. Kelner
                    7 World Trade Center, Suite 2700
                    New York, New York 10007
                    (212) 425-0700